Melissa A. Fortunato (SBN 319767)
  fortunato@bespc.com
Marion C. Passmore (SBN 228474)
  passmore@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSAYI LAWANI, derivatively on behalf of FIGS, INC., | Case No.: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SHEILA ANTRUM, HEATHER HASSON, A.G. LAFLEY, JEFFREY D. LAWRENCE, KENNETH LIN, MICHAEL SOENEN, CATHERINE SPEAR, TULCO, LLC, THOMAS TULL, DANIELLA TURENSHINE, CHRISTOPHER VARELAS, JEFFREY WILKE, and J. MARTIN WILLHITE, | |
| Defendants, | |
| and | |
| FIGS, INC., | |
| Nominal Defendant. | |

## INTRODUCTION

Plaintiff, Osayi Lawani ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of Nominal Defendant FIGS, Inc. ("FIGS" or the "Company"), submits this Verified Shareholder Derivative Complaint against Defendants (as defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by FIGS with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by FIGS; (iii) securities class actions against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading between May 27, 2021 and February 28, 2023 (the "Relevant Period") with respect to FIGS's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning FIGS.

## NATURE OF THE ACTION

1. This is a shareholder derivative action asserted on behalf of Nominal Defendant FIGS against certain officers and the members of the Company's Board for their breaches of fiduciary duties.

2. FIGS is a direct-to-consumer healthcare apparel and lifestyle brand that primarily sells its products in the United States through the Company's digital platforms. The Company's primary apparel product is medical scrubs, but it also offers other healthcare apparel including lab coats, outerwear, activewear, loungewear, compression socks, footwear, and masks.

3. During the Relevant Period, FIGS claimed that due to the Company's access to significant customer data, it was able to maintain an efficient and steady

supply chain, and that it would become less dependent on using air freight carriers to ship its products.

4.      In truth, however, the Company's access to customer data did not allow FIGS to mitigate supply chain problems through predictable sales. Instead, FIGS had to increasingly rely on air freight, which costs materially more than the overseas water transportation shipping it had previously relied on for its business.

5.      Throughout the Relevant Period, FIGS was: (i) engaged in a high-risk merchandising model that included developing numerous new styles per quarter for which demand was untested, and: (a) was either failing to consider data and analytics in making purchase orders; or (b) did not have the data capabilities to reliably predict demand; (ii) relying heavily on expensive air freight in order to compensate for inadequate demand planning; (iii) experiencing rising levels of inventory, including of non-core products; and (iv) incurring significant costs related to each of the above. To conceal these issues from investors and to artificially inflate and maintain inflation of the Company's share price, the Individual Defendants (defined herein) issued a series of material misstatements and omitted material facts in the Company's public filings, press releases and other documents throughout the Relevant Period. These material misstatements and omissions created the false impression that FIGS had a highly effective, low-risk merchandising model supported by unusually sophisticated data-related capabilities and a set of nondiscretionary core styles, which enabled it to effectively manage inventory and primarily utilize ocean freight for freight-in except under exceptional circumstances such as those created by COVID-19.

6.      Specifically, the Individual Defendants failed to inform investors that: (i) the Company inflated its true ability to successfully secure repeat customers; (ii) FIGS was becoming more dependent on air freight; (iii) FIGS inflated the expected net revenues, gross margin, and adjusted EBITDA margin for 2022; and (iv) as a result, of the foregoing, the Individual Defendants' statements about the Company's

business, operations, and prospects were materially misleading and lacked a reasonable basis.

7.      As a direct and proximate result of the misconduct described herein by the Individual Defendants, FIGS has sustained significant damages as described below.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Securities Exchange Act of 1934 ("Exchange Act") and Section 11(f) of the Securities Act of 1933 ("Securities Act"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. This Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to FIGS occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

11.     Plaintiff is a shareholder of FIGS and has been a shareholder during the Relevant Period. She has continuously held stock in the Company at all times relevant to the wrongdoing by the Individual Defendants alleged herein.

12.     Nominal Defendant FIGS is incorporated under the laws of Delaware, and its principal executive offices are located at 2834 Colorado Avenue, Suite 100, Santa Monica, California. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "FIGS."

13.     Defendant Sheila Antrum ("Antrum") has been a member of the Board since May 2021. She has served as a member of the Nominating and Corporate Governance Committee ("Governance Committee) since 2021. Defendant Antrum also served on the Audit Committee from May 2021 until April 2022.

14.     Defendant Heather Hasson ("Hasson") is the Co-Founder and Executive Chairperson of FIGS. She served as Co-Chief Executive Officer ("CEO") and director of the Company from its founding in 2013 until August 4, 2022. On August 4, 2022, Defendant Hasson's title and role transitioned to Executive Chair. Defendant Hasson is a named defendant in a securities case captioned *Ryan v. FIGS, Inc. et al.*, Case No. 2:22-cv-07939, filed in the United States District Court for the Central District of California (the "Securities Class Action").

15.     Defendant A.G. Lafley ("Lafley") has been a member of the Board since April 2022. He has also served as a member of the board of directors of Tulco, LLC ("Tulco") since September 2017. Defendant Lafley is also a shareholder of Tulco.

16.     Defendant Jeffrey D. Lawrence ("Lawrence") served as FIGS's Chief Financial Officer ("CFO") from December 2020 until his abrupt departure on December 24, 2021. Defendant Lawrence is a named defendant in the Securities Class Action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17.     Defendant Kenneth Lin ("Lin") has been a member of the Board since April 2022 and has served as a member of the Audit Committee since April 2022.

18.     Defendant Michael Soenen ("Soenen") has been a member of the Board since May 2021 and has served as Chair of the Audit Committee since 2021.

19.     Defendant Catherine "Trina" Spear ("Spear") is the Co-Founder and CEO of FIGS and has been a member of the Board since 2013. She also served as co-CEO, alongside Hasson, from FIGS's founding in 2013 through August 4, 2022. Defendant Spear is a named defendant in the Securities Class Action.

20.     Defendant Tulco is a venture capital investment firm founded and controlled by Defendant Thomas Tull ("Tull"). Throughout the Relevant Period, Tulco controlled a significant percentage of FIGS's voting interest through its ownership of FIGS common stock. Given its substantial holding of FIGS's common stock, Tulco had the power to control, and did control FIGS during the Relevant Period. Tulco is a named defendant in the Securities Class Action.

21.     Defendant Tull is the founder, Chairman, and Executive Officer of Tulco.

22.     Defendant Daniella Turenshine ("Turenshine") has served as the Company's CFO since December 2021. She also served as FIGS's Senior Vice President of Finance and Strategy from November 2018 to December 2021. Defendant Turenshine is a named defendant in the Securities Class Action.

23.     Defendant Christopher Varelas ("Varelas") joined FIGS's Board in connection with the Company's Initial Public Offering ("IPO") in May 2021 until he suddenly retired in August 2021.

24.     Defendant Jeffrey Wilke ("Wilke") has been a FIGS director since April 2022 and has served on the Audit Committee since April 2022.

25.     Defendant J. Martin Willhite ("Willhite") is Tulco's representative on FIGS's Board. He has been a member of the Board since February 2019. Defendant Willhite has served as Vice Chairman of Tulco since July 2017.

26.     The following Defendants are collectively referenced herein as the "Individual Defendants": Antrum, Hasson, Lafley, Lawrence, Lin, Soenen, Spear, Tulco, Tull, Turenshine, Varelas, Wilke, and Willhite.

27.     The following Individual Defendants are collectively referenced herein as the "Director Defendants": Antrum, Hasson, Lafley, Lin, Soenen, Spear, Varelas, Wilke, and Willhite.

28.     The following Individual Defendants are collectively referenced herein as the "Officer Defendants": Hasson, Lawrence, Spear, and Turenshine.

29.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Antrum, Lin, Soenen, and Wilke.

30.     The following Individual Defendants are collectively referenced herein as the "Governance Committee Defendants": Antrum and Willhite.

31.     The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants": Hasson and Spear.

32.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Hasson, Lawrence, Spear, Tulco, Tull, Turenshine, and Willhite.

33.     The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

34.     The following chart identifies the Individual Defendants, their associated references herein, and other relevant information discussed in more detail below:

| Individual Defendants | Director Defendants | Officer Defendants | Audit Committee Defendants | Governance Committee Defendants | Insider Trading Defendants | Securities Class Action Defendants |
|---|---|---|---|---|---|---|
| Antrum | May 2021-present | | May 2021-Apr. 2022 | 2021-present | | X |
| Hasson Co-Founder | 2013-present Exec. Chair | Co-CEO 2013-Aug. 2022 | | | X | X |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Aug. 2022-present | | | | | |
| Lafley | Apr. 2022-present | | | | | |
| Lawrence | | CFO Dec. 2020-Dec. 2021 | | | | X |
| Lin | Apr. 2022-present | | Apr. 2022-present | | | |
| Soenen | May 2021-present | | Chair 2021-present | | | |
| Spear Co-Founder | 2013-present | Co-CEO 2013-Aug. 2022 | | | X | X |
| Tulco | | | | | | X |
| Tull | | | | | | X |
| Turenshine | | Sr. VP Finance & Strategy Nov. 2018-Dec. 2021 CFO Dec. 2021-present | | | | X |
| Varelas | May 2021 - Aug. 2021 | | | | | |
| Wilke | Apr. 2022-present | | Apr. 2022-present | | | |
| Willhite | Feb. 2019-present Vice-Chair June 2017-present | | | Chair 2021-present | | X |

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS SHAREHOLDERS

35.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its shareholders, the members of the public who had invested in FIGS.

36.     By reason of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith,

loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

37.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

38.     Each of the Company's directors owes to the Company and its shareholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

39.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

40.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers, and directors of FIGS were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make

accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

41. The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its shareholders despite their knowledge of the risk of serious injury to the Company.

42. Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by FIGS.

43. The FIGS Board has adopted a Code of Business Conduct and Ethics (the "Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Director Defendants and the Officer Defendants, including the following:

- Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with all applicable district, state, and federal laws rules, regulations, and requirements, and pursuant

to FIGS's Code of Conduct and internal guidelines;

- Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to provide the highest quality performance of its business;

- Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

- Maintain and implement an adequate system of internal legal, financial, and management controls to ensure that FIGS's operations would comply with all laws and that FIGS's regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

- Refrain from unduly benefitting themselves and other Company insiders at the expense of the Company; and

- When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to rectify the misconduct and prevent its recurrence.

**THE DIRECTOR DEFENDANTS ON PARTICULAR COMMITTEES OWE ADDITIONAL DUTIES**

44.     The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Defendants Antrum, Lin, Soenen, and Wilke during the Relevant Period.

45.     Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the following:

- *Appointment and Oversight.* The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including

resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

- *Annual Report on Independence and Quality Control.* The Committee must, at least annually, obtain and review a report from the independent auditor describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence.

- *Audit Problems.* The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- *Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

- *Form 10-Q Review.* The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- *Review of Earnings Releases.* The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

- *Risk Assessment and Risk Management.* The Committee must discuss the Company's policies with respect to risk assessment and risk management.

- *Hiring of Independent Auditor Employees.* The Committee must set clear hiring policies for employees or former employees of the Company's independent auditor.

- *Complaint Procedures.* The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

- *Review of Related Person Transactions.* The Committee must review any related person transactions brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

- *Reports to the Board of Directors.* The Committee must report regularly to the Board regarding the activities of the Committee.

- *Committee Self-Evaluation.* The Committee must at least annually perform an evaluation of the performance of the Committee.

- *Review of this Charter.* The Committee must periodically review and reassess this Charter and submit any recommended changes to the Board for its consideration.

46.     The Nominating and Governance Committee Charter (the "Governance Charter") imposes additional duties and responsibilities on the members of the Board's Governance Committee, which included Defendants Antrum and Willhite during the Relevant Period. Among the duties imposed by the Governance Charter are the following:

- *Director Nominees.* The Committee will identify individuals qualified to become members of the Board and ensure that the Board has the requisite expertise and that its membership consists of persons with sufficiently diverse and independent backgrounds. The Committee will also recommend to the Board the nominees for election to the Board at the next annual meeting of stockholders.

- *Criteria for Selecting Directors*. The criteria to be used by the Committee in recommending directors and by the Board in nominating directors are as set forth in the Company's corporate governance.

- *Board Committee Structure and Membership.* The Committee will annually review the Board committee structure and recommend to the Board for its approval directors to serve as members of each committee.

- *Board Leadership Structure.* The Committee will periodically review the Board's leadership structure to assess whether it is appropriate given the specific characteristics and circumstances of the Company and recommend any proposed changes to the Board.

- *Director Changes in Position or Circumstances.* The Committee will review any notification by a director of his or her resignation or material changes in employment or of circumstances that may adversely reflect upon the director or the Company, in accordance with the Corporate Governance Guidelines. Based on this review, the Committee may recommend that the Board request such director to resign from the Board.

- *Corporate Governance Guidelines.* The Committee will develop and recommend to the Board the Corporate Governance Guidelines. The Committee will, from time to time as it deems appropriate, review and reassess the adequacy of such Corporate Governance Guidelines and recommend any proposed changes to the Board for approval.

- *Board Evaluation.* The Committee will oversee the annual self-evaluations of the Board.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- *Succession Planning.* The Committee will be responsible for overseeing the Company's succession plan for any Chief Executive Officer and other executive officer roles.
- *Other Corporate Governance Matters.* The Committee may make recommendations to the Board regarding governance matters, including, but not limited to, the Company's amended and restated certificate of incorporation, amended and restated bylaws, and the charters of the Company's other committees.
- *Reports to the Board of Directors.* The Committee must report regularly to the Board regarding the activities of the Committee.
- *Committee Self-Evaluation.* The Committee must at least annually perform an evaluation of the performance of the Committee.
- *Review of this Charter.* The Committee must periodically review and reassess this Charter and submit any recommended changes to the Board for its consideration.

## BACKGROUND OF THE COMPANY

47. Nominal Defendant FIGS is a direct-to-consumer healthcare apparel and lifestyle brand. The Company creates technically advanced apparel and products at an affordable price for healthcare professionals. FIGS's products include scrubwear, lab coats, underscrubs, outerwear, activewear, loungewear, compressions socks, footwear, and masks.

48. More than a uniform, the Company advertises its apparel to be made with "Technical Comfort": the conviction that design, comfort, and function are non-negotiable. Technical Comfort is FIGS's proprietary fabric technology that is purportedly made from the best combination of materials and its durability can withstand the demands of healthcare professionals without sacrificing comfort.

49.     The Company primarily sells its products in the United States through digital platforms.

**THE INDIVIDUAL DEFENDANTS BREACH**
**THEIR DUTIES TO THE COMPANY AND ITS SHAREHOLDERS**

50.     Through a series of communications, the Individual Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) the Company had inflated its true ability to successfully secure repeat customers; (ii) FIGS was increasingly depending of air freight to ship its merchandise; (iii) FIGS had inflated the expected net revenues, gross margin, and adjusted EBITDA margin for 2022; and (iv) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

51.     On December 31, 2020, six months prior to the Company's initial public offering ("IPO"), FIGS hired defendant Lawrence.

52.     On or about May 5, 2021, FIGS filed a Registration Statement on Form S-1 with the SEC. Following a series of amendments, on May 26, 2021, the SEC declared the Registration Statement effective for the sale of the Company's Class A common stock for public sale (together, the "IPO Registration Statement").

53.     On May 28, 2021, FIGS filed a Prospectus on Form 424B4 (together with the IPO Registration Statement, the "IPO Offering Documents"). The Company was offering 4,636,364 shares of Class A common stock and Tulco was offering an additional 21,749,999 shares of Class A common stock at $22 per share.

54.     FIGS estimated that the total amount raised in the IPO would be around $580.5 million, with almost $96 million going to the Company and around $450 million going to Tulco, after the underwriting discount but before expenses.

55.   On June 1, 2021, the Company completed its IPO, which generated approximately $95.1 million in gross proceeds and Defendant Tulco generated almost $450 million in proceeds.

56.   The IPO Offering Documents were signed by Hasson, Spear, and Lawrence. Willhite, acting within the scope of his authority as a director of FIGS and as a representative agent of Tulco, also authorized his signature on the IPO Offering Documents.

57.   In the IPO Offering Documents FIGS touted that the Company's customer data approach strategy would purportedly lead to operational supply chain efficiencies. In relevant part, the Registration Statement stated as follows:

> Our DTC [direct-to-consumer] strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns. This leads to operational efficiencies throughout our supply chain, inventory management and new product development.

> \*   \*   \*

> We capture demographic, geographic and psychographic data that enables us to reliably predict buying patterns, leading to operational efficiencies throughout our supply chain, inventory management and new product development.

> \*   \*   \*

> Data is an essential and embedded capability throughout our organization. We have centralized Data Science and Data Engineering teams and decentralized Data Analysts working directly within each key functional area. This approach enables the harvesting and management of extensive data, the development of a suite of proprietary tools, and the direct and rapid application of data science in core operating activities and decision-making processes throughout the company.

> The scale of our data is vast and growing. A rich set of hundreds of data attributes is associated with millions of customers; the customer data set is a blend of first-party, deterministic and observed behaviors along with a complementary, expanded set of enriched elements derived from data science. In addition, we have established a unique approach to capturing and tracking precise and granular data from all stages of the order journey. These extensive data sets are used to build proprietary data science solutions applied to key functions across the company,

including product, supply chain, merchandising and inventory management, marketing and customer experience.

\* \* \*

**Supply Chain**

We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping. This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics). By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency.

\* \* \*

We have built a supply chain that is optimized for our business and through which we control the design, development and fulfillment of our products.

58.    The IPO Offering Documents also claimed FIGS paid particular attention to "demographic, geographic and psychographic data that enables us to reliably predict buying patterns, leading to operational efficiencies throughout our supply chain, inventory management and new product development."

59.    The IPO Offering Documents also emphasized for investors that FIGS was a low-risk company due to its primary business being uniforms rather than more discretionary apparel: "Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings."

60.    Similarly, the IPO Offering Documents claimed that FIGS could minimize inventory risk by being careful with its purchasing decisions. Under a boldface heading reading "Highly Effective Merchandising and Product Launch Model," the IPO Offering Documents stated: "For our limited edition colors and styles, we utilize a disciplined buying approach with shallow initial buys and data-driven repurchasing decisions to minimize inventory risk while creating scarcity." The

document continued: "This innovative, lower-risk merchandising strategy drives recurring demand while maintaining inventory efficiency."

61. The Management Discussion and Analysis section of the IPO Offering Documents contained the following misrepresentation:

> We have a highly efficient merchandising model. Due to the nondiscretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings. In 2020, we generated 82% of net revenues from our 13 core scrubwear styles, 5% of net revenues from limited edition scrubwear styles, and the remaining 13% from our lifestyle apparel and other non-scrub offerings.

62. The IPO Offering Documents also misrepresented that air freight was being used only as a response to supply chain disruptions arising from the COVID-19 pandemic, failing to disclose the true frequency and additional reasons FIGS utilized the more expensive shipping method. The IPO Offering Documents attributed the use of air freight to purportedly help manage COVID-19 pandemic disruptions the Company was experiencing. In particular, the IPO Offering Documents stated the following:

> Certain of the Company's suppliers experienced delays and shutdowns due to the COVID-19 pandemic. In order to manage the impact of these disruptions and meet its customers' expectations, the Company increased the use of more costly air freight during 2020 and during the three months ended March 31, 2021, which increased cost of goods sold. The Company has not experienced the pandemic's adverse impacts in any additional material respect.

63. The IPO Offering Documents misrepresented that FIGS maintained low inventory risk, purportedly because the Company had data analytics capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand" and because FIGS was supposedly operating a "lower-risk merchandising strategy" focused on its core products rather than rapid development of hundreds of new products.

64.     The statements identified in ¶¶ 50-63 above were false and misleading when made because FIGS moved away from healthcare apparel that was non-discretionary and subject to replenishment, could not reliably predict buying patterns, and did not have operational efficiencies or low inventory risk arising from the Company's data analytics capabilities and the Company's core product strategy.

65.     On August 12, 2021, the Company issued a press release announcing its second quarter 2021 financial results with the SEC ("2Q2021 Press Release"). Therein, Defendants Hasson and Spear are quoted stating that "[w]e are extremely pleased to have delivered strong financial performance in our first quarter as a public company following a successful IPO. We are so proud to have completed our public offering in the only way we could have imagined – by ringing the bell with as many Awesome Humans as we could fit on the podium right alongside us" and that "[w]e generated over $100 million in net revenues, we grew to 1.6 million active customers, and we continued to drive growth in a sustainable way."

66.     The 2Q2021 Press Release further stated that the Company "will continue to make investments that expand your access to the best products, the most seamless direct-to-consumer experience, and to share your stories with the world."

67.     The Form 10-Q released on August 12, 2021 stated:

> We experienced increased demand in 2020 and in the six months ended June 30, 2021, while certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, are experiencing delays, in the past have experienced shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic. In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight during 2020 and in the six months ended June 30, 2021, which increased our cost of goods sold, and we may from time to time need to continue to use more expensive air freight in the future.

68.     During the related earnings call, the following exchange happened between an analyst and Defendant Lawrence:

**Analyst**—. . . And second, with respect to the supply chain, I guess, Jeff, this is just a point of clarification. You talked about bringing product in via air and recognizing that reflects a lot of the challenges happening in the COVID crisis. But in normal times, how much airfreight do you use? Or is this – would this really be an extraordinary note?

**Lawrence**—Yes, Brian, thanks. I'll take the second part of that first, just around airfreight. We have a very well-healed and sophisticated inventory planning capabilities. And in normal times, airfreight is something that's more of an exception to the rule because normally, you're able to plan effectively, you put it on a boat.

And with the lack of variability that we've seen, you generally get it in time. You don't have to worry about it. Obviously, COVID has upended that entire system. So going forward, on the other side of the pandemic, again, given our inventory plan and capabilities we have today, continued investments that we'll do there, this is largely going to be ocean in the out-years.

I will also tell you, though, that if we get incremental demand that we didn't forecast, if we're launching an injection color that we're really excited about, those might be decisions where we at least consider airfreighting kind of on the other side of the pandemic. . .

69.   The statements identified in ¶¶ 65-68 above were false and misleading when made, because the Individual Defendants falsely attributed FIGS' "increased" "use of more costly air freight" to COVID-related disruptions, when in reality the Individual Defendants utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain. Additionally, if the Company had the capacity to anticipate optimal times to launch products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs.

70.   On September 14, 2021, FIGS announced that it would hold a second public offering ("SPO") during which Defendants Tulco, Hasson, and Spear would sell approximately 8.8 million shares of the Company's Class A common stock.

71.   That same day the Company filed with the SEC a Form S-1 registration form, and on September 15, 2021, FIGS filed with the SEC Form S-1MEF adding 104,284 number of securities to the SPO (collectively, the "SPO Registration").

72.     On September 17, 2021, the Company filed with the SEC a Prospectus on Form 424B4 for the SPO (together with the SPO Registration, the "SPO Offering Documents").

73.     The SPO Offering Documents reiterated and perpetuated the earlier misrepresentations that FIGS maintained low inventory risk, purportedly because the Company had data analytics capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand" and because FIGS was supposedly operating a "lower-risk merchandising strategy" focused on its core products rather than rapid development of hundreds of new products.

74.     The SPO Offering Documents were signed by Spear, Hasson, and Lawrence. Willhite authorized his signature on the SPO Offering Documents, acting within the scope of his authority as a representative agent of Tulco.

75.     The SPO Offering Documents repeated multiple claims FIGS had made in the IPO Offering Documents including touting FIGS's operational efficiencies in the supply chain due to its use of real-time customer data and continued to emphasize the tech-forward and data heavy nature of its operations. In relevant part, the SPO Offering Documents stated as follows:

> Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns. This leads to operational efficiencies throughout our supply chain, inventory management and new product development.
>
> *     *     *
>
> We maintain centralized Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the company. This approach enables us to gather and manage extensive data, and rapidly and directly apply that data to deliver customer insights and improve our core operating activities and decision-making processes.
>
> *     *     *

***Supply Chain***

We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping. This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics). By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency.

*        *        *

Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers. This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers. It also enables us to manage purchasing and inventory effectively and efficiently. We use data-driven models to predict and anticipate demand for our products. The high concentration of core scrub sales enables our merchandising and inventory models to be highly predictive, which reliably extends to limited edition product launches through advanced data science techniques. Through our customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day.

76.     Beneath a boldface header reading "Attractive Financial Profile Driving Robust Growth, Profitability and Cash Flow Generation," the SPO Offering Documents stated: "As a successful DTC brand with a highly effective merchandising model, we benefit from structurally advantaged product margins. Through our DTC strategy, we leverage data in our marketing initiatives to drive efficient customer acquisition and retention, which has contributed to our rapid growth and strong profitability."

77.     Management's discussion of their business in the SPO Offering Documents also emphasized FIGS' ability to manage its manufacturing, supply chain, and inventory:

We directly and actively manage every step of our product development and production process to ensure that our extremely high quality standards are met. We have a highly efficient merchandising model. Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings.

78.     The SPO Offering Documents further claimed, with regard to data analytics:

> In addition, we have established a unique approach to capturing and tracking precise and granular data from all stages of the order journey. These extensive data sets are used to build proprietary data science solutions applied to key functions across the company, including product, supply chain, merchandising and inventory management, marketing and customer experience.

79.     The statements identified in ¶¶ 70-78 were false and misleading because FIGS did not have low inventory risk arising from the Company's data analytics capabilities and the Company's core product strategy.

80.     The SPO Offering Documents stated as follows with respect to the Company's air freight use.

> In response to public health directives and orders and to help minimize the risk of the virus to employees, the Company has taken precautionary measures, including implementing work from home policies for certain employees. The COVID-19 pandemic has the potential to significantly impact the Company's manufacturing supply chain, distribution, logistics and other services. Certain of the Company's suppliers experienced delays and shut-downs due to the COVID-19 pandemic. In order to manage the impact of these disruptions and meet its customers' expectations, the Company increased the use of more costly air freight during 2020, which increased cost of goods sold. The Company has not experienced the pandemic's adverse impacts in any additional material respect.

81.     The SPO Offering Documents further downplayed the materiality of the air freight by stating that the Company may "from time to time need to continue to use more expensive air freight in the future."

82.     The statements identified in ¶¶ 80-81 were false and misleading for the reasons stated in ¶69.

83.     On September 20, 2021, Defendants Tulco, Hasson, and Spear completed the SPO. At the price of $40.25 per share, Defendant Tulco sold 6,366,670 shares of FIGS Class A common stock with proceeds of $256, 258, 468; and Defendants Hasson and Spear sold 3,888,322 shares for proceeds of $156,504,960.50.

84.    On November 10, 2021, the Company released Q3 2021 results on SEC Form 10-Q, signed by Hasson, Spear, and Lawrence, and held a conference call the same day (the "Q3 2021 Earnings Call"). The Company reported that Adjusted EBITDA margin had declined from 33.5% to 21.6% quarter-over-quarter, and COGS had increased from $20.1 million to $28 million, which the company attributed partially to "faster but more expensive air freight" and partially to an increase in order volume.

85.    The Management Discussion and Analysis of Financial Condition and Results of Operations section of the Form 10-Q stated:

> We have a highly efficient merchandising model. Due to the nondiscretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings.

86.    The Form 10-Q further stated:

> [T]he majority of our revenue is generated by our core scrubs styles in core colors, which are in demand year-round. As a result, we have been able to produce our raw materials and finished products farther in advance and hold greater inventory without significant risk of obsolescence or exposure to seasonality.

87.    During the Q3 2021 Earnings Call, and in the Form 10-Q, Hasson, Spear, and Lawrence made false and misleading statements designed to downplay the impact of increased air freight and reassure investors that FIGS' maintained low inventory risk due to its core products strategy and data analytics capabilities.

88.    During the Q3 2021 Earnings Call, Defendant Spear stated that FIGS would always "have a steady supply of products that health care professionals come back all year round to replenish."

89.    In response to an analyst's question regarding how the Company was planning to address any holiday season supply chain issues, Defendant Spear responded as follows:

Okay. So from a supply chain perspective, we're in a really strong position because we have 3 structural advantages: number one, we're a uniform company, which means that our customers need our products in order to do their jobs, so demand is predictable. We have a nonseasonal business and we have a replenishment-driven business.

This gives us an incredible amount of visibility into the products we need to make when we need to make them and the quantities in which to make them in. So in turn, that allows us to lock in costing and capacity and bring in goods farther in advance.

Second, we have a highly consistent fabrication and style profile. As we've discussed, more than 90% of our product is made with the same fabrication, FIONx, and more than 80% of our volume comes from 13 core scrubwear styles. What does that do? It results in a very consistent high volume, low SKU count production, which makes us essentially a supplier's dream.

Third, we're a direct-to-consumer company. Because of that, we're able to forecast even more accurately and farther in advance because we have a direct relationship with our 1.7 million customers. And we have all this data that helps us to know what product they need and when they need it. This allows us to provide 12- to 18-month rolling forecasts to our suppliers, and it also means we could adjust our calendar and our launch schedule, if there is any delay. We're not waiting on a PO from a wholesaler that, then, we have to get from our supply chain.

All these structural advantages allow us to be highly efficient from a production and supply chain standpoint and allow us to weather any macro challenges much better than other companies.

90.     In response to question from an analyst about FIGS's supply chain, Defendant Spear once again claimed:

And from a demand side, our health care professionals are demanding FIGS products and we're seeing that demand. And so what we've done, and that's really why we made that decision for – in the fourth quarter, where we're bringing – we're utilizing air freight more, to get those products for our health care professionals, would we be able to see more revenue if we were able to get more products? Potentially. But I think what we've done is we forecasted a really healthy growth rate coupled with profitability that is best in class to be able to meet the demand that we're seeing. But we're continually evaluating that. And I think one of the unique things that we also have here at FIGS is that ability to forecast that demand in a really accurate way because we're DTC, because we're data-driven.

91.     During the same call, Defendant Lawrence toned down the fact that FIGS was becoming more dependent in air freight. Defendant Lawrence falsely mitigated cost concerns to investors by stating "we're going to see less airfreight overall than

we're seeing it in [the fourth quarter] as we get into [2022]. So we don't think it's going to be airfreight business ongoing. That was really just a reaction to the in-transit issues that everyone's having."

92.     The statements identified in ¶¶ 84-91 above were false and misleading because FIGS did not have low inventory risk arising from the Company's data analytics capabilities and the Company's core product strategy.

93.     In reference to the use of air freight, the 3Q Form 10-Q again stated:

> [T]he ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays, port congestion, increased ocean freight rates and labor shortages. As a result, certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, have experienced delays and shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic. In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future, including in the fourth quarter of 2021.

94.     Then on the same Q3 2021 Earnings Call, Defendant Lawrence stated:

> From a supply chain perspective, we are monitoring the rapidly evolving macro challenges surrounding inbound freight, especially with the upcoming holiday season. As Trina mentioned, given these challenges, we proactively made the decision to air freight more goods during Q4 based on the demand for our products, coupled with the reality of operating a global supply chain in a COVID-19 world.

95.     Defendant Lawrence further stated: "So we don't think it's going to be air freight business ongoing. That was really just a reaction to the in-transit issues that everyone's having."

96.     Defendant Spear also responded to analysts' questions on the Q3 2021 Earnings Call regarding air freight and stated that the increased use of air freight was attributable to supply chain issues and that it was a "transitory strategic decision" and added: "And it's not just that we see the world opening up and the supply chain

pressures easing, also, we've made very big moves in terms of bringing in more inventory earlier."

97.     The statements identified in ¶¶ 93-96 were false and misleading for the reasons stated in ¶69.

98.     On January 10, 2022, Defendant Spear and Defendant Turenshine represented the Company during the ICR Conference.  Both made materially false and misleading statements regarding the stability of FIGS's business and profitability arising from its core products strategy and regarding FIGS's continuing use of air freight.

99.     During the conference, Defendant Spear stated:

> I think in terms of the business, from a supply chain perspective, we saw in the fourth quarter we utilized airfreight to get our goods in, and we're happy that we did that. We met the demand, right? And we were able to get our products in to meet the demand and get them to our health care professionals. Going forward – and we really do view that as the peak. And so we've moved a lot of the shipments to ocean freight. We have seen rates be a bit elevated or continue to be a little bit elevated on that front. But going forward, we're excited to utilize more ocean and really continue to navigate and be best-in-class as it relates to operational excellence and supply chain excellence.

100.    Turenshine agreed, saying: "But what I can tell you is that we really do see Q4 as a peak in terms of air freight spend. And for the full year 2022, we do not anticipate needing to use the same level of air freight that we did in the prior year." She went on: "[S]o we are reducing the amount of air freight that we're using, and this is also because we put strategies in place in Q4 to be able to do that, right?"

101.    The statements identified in ¶¶ 98-100 were false and misleading for the reasons stated in ¶69.

102.    During the same conference, Defendant Turenshine stated that FIGS would have a 70% plus gross margin guidance for 2022.  Turenshine emphasized FIGS' core products strategy as key to FIGS's stability of margins and profitability, stating in relevant part:

So I've been a part of building this business and really have a deep understanding of the drivers of our gross margin and really firmly believe that many of the structural advantages that we get from being a replenishment uniform business are what are going to be able for us to deliver on that 70%-plus gross margin. So we've been very consistent in this metric, even as we've continued to innovate and really build out the lifestyle portion of our business. And we've been able to maintain it despite a lot of the macro supply chain challenges that we've been facing recently. So it gives us a lot of confidence in our ability to be able to continue to do that.

A lot of this comes from, as I mentioned, the structural advantages that we have in our business. So we're a uniform replenishment business. 90% of our fabrication – 90% of our revenue is from the same fabrication. 80% is from the same 13 core scrubber styles. So we get a lot of scale and costing efficiencies as we grow, and we're able to take those benefits and really put them back into innovating in the lifestyle product and building out some of those categories while not seeing a change in kind of the overall gross margin.

103.   The statements in ¶ 102 were false and misleading because FIGS did not have low inventory risk arising from the Company's core product strategy.

104.   On March 8, 2022, the Company announced its fourth quarter and full year 2021 financial results. The Form 8-K was signed by Defendant Turenshine.  The Company also held an investor call that day, and released its Annual Report for the year ended 2021 on Form 10-K two days later, on March 10, 2022 ("2021 Annual Report") which was signed by Defendants Hasson, Spear, Turenshine, and Willhite, among others.

105.   During the related earnings call, Defendant Spear affirmed that the Company's core products strategy was key to maintaining a low-risk inventory model:

The fact that half of our revenues are seasonless, enables us to produce large volumes further in advance and hold greater quantities in our warehouse with almost no inventory risk compared to traditional apparel companies. These differentiators are incredibly important because as transit times fluctuate, freight rates rise and labor shortages persist, our business model is able to endure these near-term pressures and still deliver best-in-class annual gross margins above 70%.

106.   Spear also touted the advantages that FIGS' core product strategy afforded the Company during the earnings call, stating in relevant part: "Our business is unique. It's nondiscretionary and replenishment-driven, meaning greater

predictability and consistency. This is a critical advantage for us compared to other consumer brands as almost 75% of our revenue is retained in the next year, providing a solid base for us to build upon as we grow."

107.   In the 2021 Annual Report, the Company also emphasized that "[w]e have developed a highly effective merchandising strategy, anchored by our recurring, functional offering of 13 core scrubwear styles, which represented over 80% of our net revenues in 2021."

108.   In reiterating that FIGS had "a highly efficient merchandising model," the 2021 Annual Report further noted that "due to the non-discretionary, replenishment nature of healthcare apparel, [it] maintain[ed] low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings."

109.   The Company represented that its "DTC strategy also gives us access to valuable real-time customer data that we leverage in all aspects of our business, including apparel design and merchandising, customer acquisition and retention, demand forecasting and inventory optimization, leading to operational efficiencies throughout our supply chain, inventory management and new product development."

110.   The 2021 Annual Report also noted: "As a successful DTC brand with a highly effective merchandising model, we benefit from structurally advantaged product margins."

111.   With respect to its "limited edition colors and styles," the 2021 Annual Report highlighted FIGS's "disciplined buying approach," stating in relevant part:

> [W]e utilize a disciplined buying approach with shallow initial buys and data-driven repurchasing decisions to minimize inventory risk while creating scarcity. We launch limited edition colors, limited edition styles or new products almost every week, driving recurring traffic to our digital platform where customers often purchase limited edition products along with our core offerings. These launches not only drive interest in the limited edition products themselves, they also drive our core business. This innovative, lower-risk merchandising strategy drives recurring demand while maintaining inventory efficiency.

112. The 2021 Annual Report continued touting the Company's "Merchandising and Inventory Management," stating in relevant part:

> Through our customer ontology, we develop precisely defined customer segments and a mosaic representation of our customers. This approach enables us to understand buying behaviors, preferred DTC channels, product preferences and decision drivers. It also enables us to manage purchasing and inventory effectively and efficiently. We also use data-driven models to predict demand for our products. The high concentration of core scrubwear sales enables our models to be highly predictive, which reliably extends to limited edition launches, and we are able to anticipate optimal times for launch, including day of week and time of day.

113. The Form 10-K filed on March 10, 2022 also included several speculative and contingent risk factors for risks that already transpired:

> If we are unable to accurately forecast customer demand, manage our inventory and plan for future expenses, our results of operations could be adversely affected.

> We base our current and future inventory needs and expense levels on our operating forecasts and estimates of future demand. To ensure adequate inventory supply, we must be able to forecast inventory needs and expenses and place orders sufficiently in advance with our suppliers and manufacturers, based on our estimates of future demand for particular products. . . . Accordingly, if we fail to accurately forecast customer demand, we may experience excess inventory levels or a shortage of products available for sale. Inventory levels in excess of customer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer and could impair the strength and premium nature of our brand.

114. The statements identified in ¶¶ 104-13 were false and misleading because FIGS did not have low inventory risk arising from the Company's data analytics capabilities and the Company's core product strategy.

115. With respect to air freight, the 2021 Annual Report again indicated that FIGS used it as a mere stopgap measure to respond to COVID-19 and related macro conditions, stating in relevant part: "We have also from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future."

116.   The 2021 Annual Report went on:

We have also from time to time used faster but more expensive air freight in the quarter and year ended December 31, 2021, which increased our cost of goods sold.

Our replenishment-driven model has also been a key part of our ability to navigate these challenges. Nearly 90% of our production utilizes our main scrubwear fabric technology FIONx and almost half of our revenue is generated by our core scrubwear styles in core colors, which are in demand year-round. As a result, we have been able to produce our raw materials and finished products farther in advance and hold greater inventory without significant risk of obsolescence or exposure to seasonality.

We believe we have managed effectively through COVID-19 logistical challenges. We nevertheless expect we will continue to contend with elevated ocean and air freight rates, unpredictable ocean transit times and other COVID-19 related logistical challenges.

117.   The statements in ¶¶ 115-16 were false and misleading for the reasons stated in ¶69 and because the Company later disclosed that it was heavily reliant on air freight and had continued to incur high air freight costs, contrary to the assertions here.

## **THE TRUTH IS REVEALED**

118.   On May 12, 2022, FIGS issued a press release announcing its first quarter 2022 financial results ("1Q2022 Press Release"). The press release revealed that FIGS's gross margin was 71.2%, which represented a 0.4% year-over-year decrease. The Company attributed the decrease to "higher air freight spend as well as increased ocean and air freight rates," which it claimed was "partially offset by improvements in product costing."

119.   The 1Q2022 Press Release also revealed that the Company had restated its full year 2022 guidance.  FIGS slashed its expected net revenues, gross margin, and EBITDA despite having expressed confidence in their ability to meet these targets just two months earlier during the March 8, 2022 earnings call. The Company lowered its 2022 financial guidance for net revenues from $550 to $560 million to just $510 to

$530 million based purportedly on "supply chain challenges and broader macroeconomic factors, including high inflation and shifts in consumer spending patterns." The Company previously expected gross margin to be 70% or greater but lowered it to 67 to 68% "primarily due to a significant increase in the Company's use of air freight to help mitigate supply chain challenges." While Adjusted EBITDA was previously expected to be upwards of 20%, the Company adjusted its expectations margin to 16 to 18%.

120.   During the earnings call that same day, Defendant Spear revealed that the Company lacked the visibility into inventory management that they professed to have, which resulted in the use of expensive air freight for less in-demand products while new color launches and stocked-out styles remained on ocean freight.

121.   On this news, shares of FIGS stock dropped nearly 25% from a close of $12.85 per share on May 12, 2022, to $9.64 per share on May 13, 2022.

122.   On February 28, 2023, FIGS issued a press release announcing disappointing financial results for the fourth quarter and full year 2022 ("FY2022 PR") that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K. The FY2022 PR revealed that FIGS had a 68.2% gross margin, which represented a 1.7% year-over-year decrease, while operating expenses increased 29% compared year of year with Q4 2021 and 9.1% compared year of year with FY2022. FIGS attributed the increase in operating expenses to higher selling expenses related to fulfillment increase.

123.   The FY2022 PR further revealed a dismal financial outlook for 2023 with net revenues expected to experience only mid-single digit growth and an adjusted EBITDA margin of 11%-12%. Recognizing that these disappointing results stood in stark contrast to the misstatements described herein, Turenshine attempted to allay investor concerns for the Company's future in the FY2022 PR, stating in relevant part:

Our growth outlook for 2023 is not representative of the growth we believe we can achieve long term. That is why we plan to keep investing while managing our business prudently through near term macro and cost challenges. We remain a distant leader in our industry and we are confident that we can accelerate growth and deliver adjusted EBITDA margin expansion in the future.

124.   In response to this news, the price of FIGS stock declined by $2.45 per share, or nearly 27%, from a closing price of $9.21 per share on February 28, 2023, to a closing price of $6.76 per share on March 1, 2023, on unusually high trading volume.

### THE INSIDER TRADING DEFENDANTS SELL COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

125.   During the period of wrongdoing described above, the Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

• Between September 20, 2021 and December 2, 2021, defendant Hasson sold 2,569,358 shares with proceeds over $102 million.

• Between September 20, 2021 and December 2, 2021, defendant Spear sold 1,645,813 shares with proceeds of over $64 million.

126.   While many of the Company's shareholders lost significant money when the price of FIGS shares dropping substantially at the end of the Relevant Period, the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by shareholders.

127.   As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of FIGS stock and stock options they held.

### AN INVESTOR FILES A SECURITIES CLASS ACTION

128.   On November 1, 2022, a purchaser of Company stock filed the Securities Class Action complaint against FIGS and Defendants Hasson, Lawrence, Spear, Turenshine, and Willhite. The complaint alleges that throughout the class period of

May 27, 2021 to May 12, 2022, defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects. On April 10, 2023, Lead Plaintiffs filed a Consolidated Class Action Complaint for Violations of the Federal Securities Laws expanding the class period to between May 27, 2021 and February 28, 2023, inclusive, and adding Tulco and Tull as additional defendants. Specifically, the complaint alleges that: (i) defendants inflated the Company's true ability to successfully secure repeat customers; (ii) defendants failed to disclose the Company's increasing dependence on air freight; (iii) defendants inflated the expected net revenues, gross margin, and adjusted EBITDA margin for 2022; and (iv) as a result, of the foregoing, defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO FIGS

129.    As a result of the Individual Defendants' improprieties, FIGS disseminated improper public statements concerning FIGS's operations, prospects, and internal controls. This misconduct has devastated FIGS's credibility.

130.    As a direct and proximate result of the Individual Defendants' actions, FIGS has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

131.    As a direct and proximate result of the Individual Defendants' actions as alleged above, FIGS's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

132.    Lastly, the actions of the Individual Defendants have irreparably damaged FIGS's corporate image and goodwill. For at least the foreseeable future, FIGS will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the

investing public, such that FIGS's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### PLAINTIFF WILL FAIRLY AND ADEQUATELY REPRESENT THE COMPANY'S AND ITS SHAREHOLDERS' INTERESTS

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

134.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

135.    Plaintiff is an owner of FIGS common stock and was an owner of FIGS common stock during the Relevant Period.

136.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

### DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY

137.    At the time Plaintiff commenced this action, the Board consisted of eight Director Defendants: Antrum, Hasson, Lafley, Lin, Soenen, Spear, Wilke, and Willhite. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

138.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning FIGS's business, operations, prospects, internal controls, and financial statements.

139.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and

were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

140.   Here, the Director Defendants failed to disclose to investors, among other things, that the Company was unable to secure repeat customers and that it was highly dependent on air freight to ship its merchandise.

141.   The Director Defendants also ignored red flags of the Officer Defendants' false and misleading statements in the form of publicly available analyses.

142.   The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

143.   If the Director Defendants were to bring a suit on behalf of FIGS to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiff's making a demand would be futile.

## THE AUDIT COMMITTEE DEFENDANTS FACE
## A GREATER LIKELIHOOD OF PERSONAL LIABILITY

144. The Audit Committee Defendants (Defendants Antrum, Lin, Soenen, and Wilke), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to the Audit Committee Defendants.

## THE GOVERNANCE COMMITTEE DEFENDANTS FACE
## A GREATER LIKELIHOOD OF PERSONAL LIABILITY

145. The Governance Committee Defendants (Defendants Antrum and Willhite) are exceptionally sophisticated members of the Board with substantial training and experience on corporate governance matters and the importance of accurate disclosures to the investing public. Accordingly, the Governance Committee Defendants had to have known about the problems with, among other things, the Company's continued dependence on air freight and inability to retain customers so that they could purchase multiple merchandise orders. Additionally, the Governance Committee Defendants are well aware of the importance of preventing insiders from trading on non-public information made available to them as officers and directors of the Company. Moreover, during the Relevant Period, the Governance Committee Defendants recommended the nomination and renomination of unqualified directors for their election and reelection as members of the Board. Therefore, the Governance Committee Defendants face a substantial likelihood of personal liability and cannot

exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

## THE INSIDER TRADING DEFENDANTS ON THE BOARD FACE A GREATER LIKELIHOOD OF PERSONAL LIABILITY

146.   Because of their positions as officers and/or Board members, each of the Insider Trading Defendants (Defendants Hasson and Spear) possessed material non-public information that the Defendants (1) inflated the Company's true ability to successfully secure repeat customers; (ii) failed to disclose the Company's increasing dependence on air freight; and (iii) inflated the expected net revenues, gross margin, and adjusted EBITDA margin for 2022.

147.   The Insider Trading Defendants unlawfully misused this information and unjustly enriched themselves by selling their shares at artificially inflated prices. As a result, the Insider Trading Defendants' conduct harmed FIGS as the Insider Trading Defendants unjustly enriched themselves at the Company's expense. Accordingly, because this action asserts claims for unjust enrichment against the Insider Trading Defendants, and because the Insider Trading Defendants face a substantial likelihood of liability for these claims as well as for their breaches of fiduciary duty to the Company, the Insider Trading Defendants are incapable of considering a demand to commence and vigorously prosecute this action.

## CERTAIN SECURITIES CLASS ACTION DEFENDANTS ON THE BOARD FACE AN EVEN GREATER LIKELIHOOD OF PERSONAL LIABILITY

148.   Certain of the Securities Class Action Defendants who are directors (Defendants Hasson, Spear, Turenshine, Lawrence, and Willhite) are named defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole

or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as directors of FIGS. Hence, these Securities Class Action Defendants are incapable of considering a demand to commence and vigorously prosecute this action because they each face an even greater likelihood of personal liability than the rest of the Director Defendants.

## **DEFENDANT WILKE LACKS INDEPENDENCE**

149. Defendant Tull is the founder, Chairman, and Executive Officer of Tulco. Per the Company's 2023 proxy statement, Defendant Tull also serves on the board of directors of Re:Build Manufacturing ("Re:Build"), where Defendant Wilke has served as chairman of the board of directors since March 2021.

150. Defendant Wilke approved the Company's IPO and SPOs, where Tulco generated over $300,000,000 in proceeds from the sale of FIGS shares.

151. Defendant Wilke cannot exercise independent business judgment in considering a demand to investigate and prosecute this action because it would require him to sue the Company and the members of the Board, and would put into question his decisions as a director of not only FIGS but of Re:Build, as well, and his qualifications to serve on both boards.

## **DEFENDANT LAFLEY LACKS INDEPENDENCE**

152. Defendant Lafley lacks independence because he is a member of the board of directors and shareholder of Tulco since September 2017. Per the Company's 2022 proxy statement, Tulco sold 6,366,670 shares of Class A Common Stock for an aggregate proceed of $247,281,463. In order to sell such shares, Tulco must have had the approval of its board of directors. Thereby, Defendant Lafley as a director of Tulco must have voted in favor of the sale of Tulco's shares in FIGS.

153. Moreover, Defendant Lafley, as shareholder of Tulco, must have directly or indirectly benefited from the sale of FIGS's shares. Thus, Defendant Lafley cannot exercise independent judgment in considering a demand to investigate and prosecute

the claims asserted in this action because it would require him to sue the Company and the members of the Board.

## DEFENDANT WILLHITE LACKS INDEPENDENCE

154. Defendant Willhite has served as Vice Chairman of Tulco since June 2017 and is Tulco's representative on the Board. Prior to that, from October 2011 to June 2017 he served as General Counsel at Legendary Entertainment, a film and television production company, where he also served as Chief Operating Officer from April 2013 to June 2017. Defendant Tull founded Legendary Entertainment in 2005 and has served as its CEO ever since.

155. Defendant Willhite allowed the IPO and SPO, in which Tulco sold a number of shares.

156. Defendant Willhite cannot exercise independent business judgment in considering a demand because it will directly put into question his actions as a director of FIGS and as Vice Chairman of Tulco, which at least represents a potential conflict of interests. Defendant Willhite could not exercise independent business judgment in considering a demand to investigate and prosecute this action because it would require him to sue the Company and members of the Board.

## DEFENDANTS HASSON AND SPEAR LACK INDEPENDENCE

157. On April 25, 2023, FIGS filed a proxy statement on Form 14A with the SEC ("2023 Proxy Statement"), which did not name Defendants Hasson and Spears as independent.

158. Defendants Hasson and Spear co-founded and served as Co-CEOs of the Company for almost twenty years and, thus, have a long-standing business and personal relationship. Defendant Hasson stepped down as CEO on August 4, 2022, but Defendant Spear continues to serve as FIGS's CEO. Each of them earned a material amount of compensation of $1,000,000 as base salary for 2022.

159.   Moreover, Defendants Hasson and Spear have a long-standing business relationship with Defendants Tulco and Tull, as Tulco was the venture capital firm that backed the beginnings of FIGS.

160.   Accordingly, Defendants Hasson and Spear could not exercise independent judgment in considering a demand to investigate and prosecute the claims asserted in this action because it would require them to sue the Company, the members of the Board, including each other, and Defendants Tulco and Tull.

**ADDITIONAL FACTS IN SUPPORT OF DEMAND FUTILITY**

161.   The 10K2021 announcing the Company's financial results for its fiscal year 2021 was signed by Defendants Hasson, Spear, Turenshine, Willhite, Antrum, and Soenen.

162.   On March 21, 2022, Defendants Tulco and Tull distributed the remaining FIGS stock. Tulco distributed 27,426,398 shares to Defendant Tull and 3,147,432 shares to Defendant Willhite.

163.   By virtue of a voting agreement executed in connection with the IPO, which became effective immediately after the IPO (the "Voting Agreement"), Defendants Hasson, Spear and Tulco constitute a control group which exercises voting control over FIGS. The Voting Agreement binds Defendants Hasson, Spear, and Tulco to vote all of their shares in favor of the election or re-election of the director Tulco nominates for election or re-election to the Board, and against any attempts to remove Defendants Hasson, Spear, or the director nominated by Tulco from the Board.

164.   The 2023 Proxy Statement also states the following:

**Controlled Company Exemption**

Heather Hasson, Catherine Spear, and the Tull Parties,[1] by virtue of the Voting Agreement and the obligations and rights thereunder, including provisions relating to the coordination of the voting of shares of our company's Common Stock held by the parties thereto, are a "group" within the meaning of Section 13(d) of the Exchange Act. Together these parties, through their beneficial ownership of our shares directly or indirectly, in the aggregate, control more than 50% of the voting power for the election of directors, and, as a result, we are considered a "controlled company" for the purposes of the NYSE listing requirements. As such, we qualify for, and rely on, exemptions from certain corporate governance requirements. As a "controlled company," we have elected not to have our compensation and nominating and corporate governance committees be fully independent. Accordingly, our stockholders may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

165. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

166. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

---

[1] Composed of Defendant Tull and his family trust.

167.  The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or with gross negligence engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

168.  Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

169.  At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and FIGS and was at all times acting within the course and scope of such agency.

**FIRST CAUSE OF ACTION**
**<u>Against the Individual Defendants for Breach of Fiduciary Duties</u>**

170.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

171.  Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of FIGS's business and affairs.

172. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

173. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of FIGS.

174. In breach of their fiduciary duties owed and owe to FIGS, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material adverse facts about the Company's business operations and prospects. Specifically, the Individual Defendants (i) inflated the Company's true ability to successfully secure repeat customers; (ii) failed to disclose the Company's increasing dependence on air freight; and (iii) inflated the expected net revenues, gross margin, and adjusted EBITDA margin for 2022. As a result, of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

175. Accordingly, FIGS's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

176. The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

177. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

178. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

179. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

180. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

181. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FIGS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## SECOND CAUSE OF ACTION
### Against the Securities Class Action Defendants for
### <u>Contribution Under Sections 10(b) and 21D of the Exchange Act</u>

182.  Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

183.  FIGS along with the Securities Class Action Defendants (Defendants Hasson, Lawrence, Spear, Tulco, Tull, Turenshine, and Willhite) are named as Defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or director of FIGS.

184.  Because of their positions of control and authority as officers and/or director of FIGS, the Securities Class Action Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of FIGS, including the wrongful acts complained of herein and in the Securities Class Actions.

185.  Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

186.  As such, FIGS is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

### THIRD CAUSE OF ACTION
**Against the Securities Class Action Defendants for Contribution**
**<u>Under Section 11(f) of the Securities Act and 21D of the Securities Act</u>**

187.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.   FIGS along with the Securities Class Action Defendants (Defendants Hasson, Lawrence, Spear, Tulco, Tull, Turenshine, and Willhite) are named as Defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.  If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or director of FIGS.

189.   Because of their positions of control and authority as officers and/or director of FIGS, the Securities Class Action Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of FIGS, including the wrongful acts complained of herein and in the Securities Class Actions.

190.   Accordingly, the Securities Class Action Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

191.   As such, FIGS is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

### FOURTH CAUSE OF ACTION
**Against the Individual**
**<u>Defendants for Unjust Enrichment</u>**

192.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, FIGS.

194.   The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from FIGS that was tied to the performance or artificially inflated valuation of FIGS, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

195.   Plaintiff, as a shareholder and representative of FIGS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

196.   Plaintiff on behalf of FIGS has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Against the Individual
### Defendants for Waste of Corporate Assets

197.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

199.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

200.   Plaintiff on behalf of FIGS has no adequate remedy at law.

## SIXTH CAUSE OF ACTION
### Against all the Individual
### Defendants for Aiding and Abetting

201.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.   Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to FIGS and have participated in a conspiracy in breach of fiduciary duties.

203.   In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

204.   The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its shareholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

205.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

206.   Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

207.   Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

### SEVENTH CAUSE OF ACTION
#### Against the Insider Trading Defendants for
#### Insider Selling and Misappropriation of Information

208.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.   At the time of their stock sales set forth herein, the Insider Trading Defendants (Hasson and Spear) knew of the information described above and sold FIGS common stock on the basis of such information.

210.   The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold FIGS common stock.

211.   The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

212.   Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

### EIGHTH CAUSE OF ACTION
#### Against the Insider Trading
#### Defendants for Indemnification

213.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214.   The misconduct by the Insider Trading Defendants (Hasson and Spear) described above gives rise to the Company's alleged liability, and thereby, the Individual Defendants have directly and proximately caused substantial injury to FIGS.

215.   Therefore, on behalf of the Company, Plaintiff seeks damages from the Insider Trading Defendants for indemnification.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of FIGS and that Plaintiff is a proper and adequate representative of the Company;

B.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.   Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of FIGS stock while in possession of insider information as described herein;

D.   Awarding prejudgment interest to the Company;

E.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

F.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.   Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 20, 2023          Respectfully submitted,

                                   BRAGAR EAGEL & SQUIRE, P.C.


                                   */s/ Melissa A. Fortunato*
                                   Melissa A. Fortunato (SBN 319767)
                                     fortunato@bespc.com
                                   Marion C. Passmore (SBN 228474)
                                     passmore@bespc.com
                                   445 S. Figueroa Street, Suite 3100
                                   Los Angeles, CA 90071
                                   Telephone: (213) 612-7735
                                   Facsimile: (212) 214-0506

                                   *Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Osayi Lawani, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9/18/2023

_____
Osayi Lawani